Counsel, Mr. Duval. My name is Herbert Beagle. I represent the appellant, Mr. Sanchez. This is also a case in which the court requested counsel to submit supplemental memos regarding qualified immunity and the impact, if any, of MADOS. I want to point out, however, that the district court in this case granted summary judgment also on the issue of excessive force. It was found there was no excessive force. So this court has to deal initially with whether or not the district court was correct with respect to excessive force. And then if the district court, as I believe, was incorrect, it has to go on to the issue of qualified immunity. All of these cases, I think, deserve to have an emphasis of the contextual framework. What distinguishes this case from a context standpoint is that there's certainly enough in the record to establish, for a jury to conclude, that the police in this case created the very situation that led to the use of. I don't understand that. And he was thought to have engaged in a violent crime and thought to be armed. That's not. Let me finish the question. I'm sorry. I'm sorry, Your Honor. As I understand it, this individual was thought to be armed and thought to have committed a violent crime. Isn't that also part of the context? It is, but it's not quite in terms of the jury could find that. But the record also supports a different analysis. First of all, you're assuming that the violent crime was a felony as opposed to a misdemeanor. What the police had was a report of domestic abuse which had been concluded. The alleged victim, Mr. Sanchez's wife, was no longer at the residence where Mr. Sanchez was. She had been. He said that he had 12 guns in the house. Excuse me? The victim said that there were many guns in the house. Yes, but there's no indication in the record that Mr. Sanchez was not entitled to have handguns. That's not the point. He can be perfectly entitled to have them, and the police can still be concerned that he will use one of those perfectly lawful weapons on them because he doesn't wish to be arrested for domestic violence. I'd like to make one of the more volatile crimes. Well, I'd like to finish my point. The crime had been completed. There's no indication in the record that the crime was even a felony. The fact of the matter is the crime. But Arizona law requires a full physical custody arrest for domestic violence. Only if it's being committed in the presence of the officer. Oh, okay. My point here, Arizona law is clear on this point. Even drug offenses, a summons, if they're completed, a summons is mailed to the residence of the house. There is no arrest for domestic violence in Arizona unless it's been committed in the presence of the officer. This offense was over. What about the threat to kill the officers? That only occurred after the officers laid siege to the house. Laid siege to the house or made a telephone call into the house. No, no. They called the SWAT team first. Then they surrounded the house. Let's do it this way by interrogatory. I'm sorry. Was there a telephone call placed by the Pima County Sheriff's deputies into the house? After the house was surrounded. Answer the question yes or no. Yes. During that telephone conversation, didn't your client threaten the lives of the officers? If they entered the house. All right. That's what I was trying to get to. Correct. Surrounding the house with a SWAT team or anybody else is not excessive force. Of course not. Of course not. But I hadn't finished how the officers proceeded to set up the situation. Okay. They engaged in a plan. I think we know that, but go ahead. Okay. Their plan was to get Mr. Sanchez to come out of the house and that, according to the officer's testimony, if he didn't comply with commands, they would tase him. That's the officer's testimony. Obviously, Mr. Sanchez is not in the position to know what was in the officer's mind. This was a private conference between the officers. Mr. Sanchez was persuaded to come out of the house, and he was persuaded to come out of the house with the representation that the officers just wanted to talk to him and there was one officer. Mr. Sanchez came out of the house in his pajamas, and he complied with the officer's direction to put his hands on the car. He was clearly on the hood of the car in the driveway. He was clearly unarmed, no one suggesting that they thought he was armed. Another officer came around the corner of the house and not only pointed the taser at Mr. Sanchez, but had it turned on where the infrared light spotlight, in effect, makes it noticeable and looks like, if you're from the point of view of a suspect, that you're about to be shot. Mr. Sanchez panicked and fled back into the house. He was tased. Well, there were 12 weapons. There were weapons in the house, but the pivotal fact here is, and we just got through an argument on the same type of thing but a little different, Mr. Sanchez was tased a third time and was lying on the floor. They couldn't see his hands at that point. Is that correct? That's inherently unbelievable. They couldn't see his hands. They couldn't see his hands. They couldn't see his hands. But they knew his hands had nothing in it. How did they? I mean, that's your conclusion. No, it isn't. After he came into a house that was filled with weapons and they couldn't see his hands, how were they to know that he didn't have a weapon in his hands? If you look at the deposition testimony in the record, from the time that they pushed against the door that he was trying to keep shut until the time he was on the floor, his hands were continuously visible. The weapons were nowhere near his body. How far was the shotgun? It was in the hallway, and he was in the family room. It was at least several feet away. I apologize for not remembering the exact dimensions. But no officer testified. There was a shotgun at the ready, had he been able to get to it by closing the door. Right, but there's no testimony by the officers that they were concerned that he could get the shotgun. The testimony from the officer was that he might have had a gun in his hand. Wasn't that the whole reason for the tug-of-war at the door, to make sure he couldn't get to his weapons? No, I respectfully disagree. The tug-of-war, there's a continuum of events here in which he was always in plain view. No officer testified that. In fact, the testimony is the opposite. But I thought he was not in plain view for a period when he ran into the house. No. The testimony of the officers, if you look at the record in this case, they admitted that all they testified to was that they tased him, but he didn't comply with the order to put his hands behind his back. The purpose of the order to put your hands behind your back when Mr. Sanchez was lying face down was not to see if he had a weapon, but to handcuff him. Well, it could have easily been both. It doesn't mean that it's only for one purpose. You know, you're under the assumption that all of the weapons were large, which isn't necessarily correct. We don't know that. And that none of them would have been found in the family room where he could get to them. And I guess I just don't – I find this quite distinguishable. You were referring to the previous cases that we've heard argument on. This is a person with known access to many firearms. And that seems to me to completely distinguish it from the other cases. Well, in my brief amount of time left, I think everything you've said is something a jury could say. But I think the Court's assumptions that it's more believable that the police thought he had a weapon, that it's more believable that he wasn't in plain view, it was more believable that the – Did he testify that his hand wasn't – was visible? Excuse me? Did he testify that at the time of the third taser that his hand was visible and that you could have seen that he didn't have a weapon? But Mr. Sanchez was dazed. He doesn't remember. So he didn't testify. No. But the officers testified that the reason for the order to put your hands was to handcuff him, and the reason for the instruction, the reason for the third use of the taser was not to prevent an armed person from attacking him, but to subdue him further, to cause him to comply. The context here is the officers testified that if Mr. Sanchez at any point did not obey a police order, he would be tased, not that if he showed some signs of having a weapon in his hand, he was in his pajamas. And with all due respect, my problem with all of this is that this is summary judgment, and I've – Isn't your other problem that even if you win, you lose, i.e., if you win on the excessive force, you're going to lose on the immunity? No. Because only – first of all, it's only a taser case, unlike the others. It's only a taser case. And second of all, it bears a – well, I would say it bears a resemblance to Brooks and Mattos because those two people were a lot less credibly dangerous than he was. That's why I pointed out in my supplemental brief that I realize under Mattos and Brooks this is a difficult obstacle to overcome with respect to the use of tasers 1 and 2. But 3, we have a man in his pajamas with a record that is legitimately debatable over whether the officer's belief that he may have been armed at that point. Suppose they didn't. And suppose – this is my point about the qualified immunity. Suppose they didn't, and they were only trying to get him to comply with their order to – so they can arrest him. Why isn't that still the Brooks case except exasperated? Because in the Brooks case, the purpose of the orders was to defuse a dangerous situation. It was to get her to comply. What was dangerous? That was the whole point. No, no. But that was – first of all, okay, that's a fair point, except the officers also testified in this case that they weren't arresting him. They were just going to talk to him. And there's no indication in this whole sequence of events that the officers ever said or suggested, Mr. Sanchez, we're arresting you, for a very good reason. You don't arrest people on the spot for domestic violence in Arizona. When a suspect threatens to kill an officer by saying, if you come into my house, I'm going to shoot you, and then runs back into the house where they know there are at least a dozen weapons inside, this is now far more than a domestic violence. I would suggest, respectfully, Your Honor, that if you're in your house and an officer says, I'm going to come into your house, and you say, if you do, I'll shoot you, that's not a crime for a very simple reason. You can't enter a house without a warrant. Counsel, you've way exceeded your time. Yes. And I think we understand your position. Thank you. Thank you. We'll hear from Mr. Dugall. Thank you. Tom Dugall and I represent the defendant, Debbie's. Sorry, I mispronounced your name. That's okay. Everybody does. Basically, the trial court did not err in granting the deputies summary judgment on qualified immunity. First of all, the deputies did not violate clearly established law. The date of the incident in this case is May of 2006, three months before the date of the incident in Matos. So just as the law was not clearly established regarding the use of the taser as of the time of the Matos incident, likewise, it was not clearly established at the time of the incident giving rise to this case. And so that's one reason why the deputies are entitled to qualified immunity. A second reason, as found by the trial court, is that the deputies did not use unreasonable force. The trial court found that each instance in which the tase was deployed was a reasonable use of force and did not violate the plaintiff's Fourth Amendment rights. The appellant, I think, makes a number of misstatements of the law and fact. He says that in Arizona, domestic violence, this was not an arrest situation. It absolutely was. In Arizona, domestic violence that results in physical injury is a mandatory arrest situation. And so the deputies in this case were faced with a mandatory arrest situation. This is a guy that had punched, choked his wife, and he was going to be arrested. Plaintiff also says that the deputies tased the plaintiff the third time with no concerns for their safety. That's completely not true at all. I mean, I think you have to look at this whole episode as one continuous, rapidly evolving event where you have a guy who engaged in physical violence against his wife, who indicated that he would use weapons against the officers when they called him up and said, he said, I have a shotgun and I'm not coming out. When they talked to him on the phone, he was yelling, he was angry, he was agitated. When he came outside into the open curtilage area, saw one of the officers, he cursed and fled back into the house where he had access to weapons, according to his wife. He had more than a dozen weapons inside. He refused to stop when given commands. At the door, he engaged in physical force to prevent the officers from coming inside. The question is focusing on the last tase. Right. How soon after the one before it was? Yeah. There's no evidence in the record as to the length of time between the second tase and the third tase. The closest evidence in the record on that is when the plaintiff was deposing the lieutenant who gave the order to tase the third time, and he says, look, I can  So he didn't have sufficient time and ability to respond to commands, and he didn't do so. So that's the closest there is. There is no time frame. And his evidence is, as I understand it, that he didn't have the time and ability because he was still out of it from the first tase. There is no evidence in the record about that. That's the lawyer's. His evidence is his evidence. He said that, no? He said he didn't even know there was a third tase because he was so out of it. Well, you won't find any evidence in the record before you from the plaintiff saying that I was tased, confused, and out of it. That's not in the record, and you won't find it. I thought what was in the record was he said I wasn't he didn't he said as far as he knew he wasn't even tased when he was on the ground. I think that's correct. In fact, he didn't even remember being tased the third time when he was on the ground. Right. The reason he That he'd been drinking that night. No. There's no evidence that he had been drinking. But, you know, at the point that he's tased the third time, at that point, the police don't know if this guy is going to continue to flee, if he's going to fight, if he's going to attempt to reach for a weapon. And the evidence is undisputed. There are numerous weapons in the house. And in answer to your question, there was a loaded shotgun found in an open closet 15 feet away from where this gentleman was laying on the ground. So I think for all of those reasons, I think the trial court properly found. Could a reasonable jury on this record find that the second tase had not run its course yet by the time they had tased him the third time and that the deputies had reason to know that? I don't think, based on the record that you have before you, I do not believe that a reasonable jury could find that, because the only evidence that's in the record before you about that is the testimony of Lieutenant Kimmons, and I think that's around pages 36, 37 of the appellant's excerpt of record, where Lieutenant Kimmons testifies that from his experience, once the tasing is over, the person is back to normal. There's no testimony in the record that there is long-term effects, discombobulation, disorientation. The question is whether they had reason to know it wasn't over. Well, Lieutenant Kimmons, the only evidence in the record is Lieutenant Kimmons testifying that, in his opinion, he waited a sufficient amount of time and that the person had the ability to respond to commands. And I think that's true. I think there was a way to tell from the noise or some sound that the taser gives. I thought there was a way to tell, not just with the passage of time. No, I don't. There's nothing in the record that would indicate that. Right. So many of these taser cases now are leading into each other. Right. But at least in some of the cases, it's right. Right. And, you know, the other thing that I would point out is that the evidence is, is that after he was tased the third time, and he was tased through the probes that were already in him, he immediately gave up his hands, which certainly indicates that even immediately after a tase, he was able to function and respond to commands. It's interesting because on page 80 of his deposition, he was asked, Were you ever tased when you were on the ground? And he answers, No, I was only tased when I was standing up. I don't know what to make of that. Well, his story was, there are a lot of differences in his story. I think he says that he was only tased twice. He doesn't remember being tased the third time, but he was. Right, from which the question is, could a reasonable jury draw the inference that he was still under the impact of the second taser, which is why he doesn't remember the third one? Well, again, I don't think so. I don't think there's any evidence in the record. Just because he said he doesn't remember being tased the third time, does that mean that a reasonable jury could conclude that he was out of it at the time he was tased the third time when he immediately displays his hands? He's given commands, Show us your hands, show us your hands. He doesn't do that. He's tased, and he immediately shows his hands. To me, I think that would suggest that he was aware of what was being said and responded accordingly. And actually, earlier on page 80 of his deposition, he also, I think, says that he wasn't complying with the commands. That's correct. And they gave numerous commands. This is not just one command. This is, you know, show us your hands, show us your hands. This notion of parsing the taser blast seems to be creeping into our jurisprudence, and I'm wondering how that squares with the Supreme Court's command. I believe it's in Graham that the law of qualified immunity has to account for the fact that these circumstances are tense, rapidly evolving, and uncertain. Right. I mean, at what point do we stand over the officer's shoulders and say, well, you can hit him twice, but the third time, we're not going to give you qualified immunity? Right. And, you know, I'm not aware of any science. I'm certainly not aware of any law that says that the effects, if you've been tased, that those effects last for X amount of time. And beyond that, when you're dealing with a tense and rapidly evolving situation, when you're dealing with a potentially violent person, who is a violent person, and who poses a potential threat to the officers, I mean, what are they supposed to do? How long were they supposed to wait? I mean, their interest was to bring this to a close immediately and not try to negotiate with him or wait for some period of time before they could be sure that he was in full capacity of his senses. I mean, I guess it's somewhat akin to concluding in a more serious case that deadly force was justified, but only the first two shots, that if you fired three, four, and five, that was not permissible. Right. I don't know how you do that. I don't know how you write an opinion that a reasonable officer could actually implement in the field under these kinds of circumstances. Right. I agree. Thank you. I have nothing else. Thank you. Mr. Biegel, you used your time, but you may have one minute for rebuttal if you want to. Very quickly, I'd like to answer the last question. I'd like a truthful answer to my first question. Why did you not know that Arizona law mandates a full physical custody arrest in a domestic violence situation where there's an injury? Because I don't believe that's correct, Your Honor. You don't think that's the law? Not after the domestic violence incident has concluded. Well, that's not the question. You'll get it. If the officers examined the wife and saw that she had actually exhibited an injury, a bruise or redness or whatever it was on her arm, doesn't the Arizona law say that where a physical injury is evident, that an arrest is mandatory? No. With an arrest warrant, you can't enter a house and arrest a person for ---- Mr. Biegel, I'm going to check the law. Okay. And if I, as I believe the law is, if it confirms what I think, that will affect my assessment of your credibility of the argument. I appreciate that. I'm giving you my honest view of the law, that when it's the person is in the residence, it requires an arrest warrant. We'll check it. But if he runs into the residence after he's threatened to shoot the police? No, that's not the context of what I was saying. I have no problem with the fact that they chased him into the residence. What I'm saying in terms of the initial context ---- Well, the reason they need a warrant ordinarily to arrest somebody to go into the house, but if they have the right generally to arrest him, but not to go into the house, but now they have the right to go into the house because he's threatening to shoot people, then this is what seems to suggest. I don't agree that they had the right to go into the house because of threat he made on the phone when he is the only one in the house. The only point I ---- the point I wanted to make, because I don't want to abuse my time, is that I think it is important. I agree that rapidly evolving situations. I agree with all of that. But what is important here is that in the tug of war they chased Mr. Sanchez the second time, he fell back from the door into the family room because he was in a very closed laundry room, and they didn't lose touch with him. They knew a jury could certainly find they knew he was unharmed. Finally, with all due respect, if an officer has the right to shoot and wound somebody twice, and he's wounded, he's incapacitated, the law certainly doesn't sanction then firing a third bullet and killing him. There are situations in which you should parse the tasers, and I don't think it adversely affects the jurisprudence of these difficult cases. Where do you have a situation where a jury could find that no reasonable officer would have believed Mr. Sanchez was armed at the time of the third taser? Thank you. The case just argued is submitted. We appreciate the arguments of both parties, and we will take about a ten-minute break. All rise.
judges: Graber, Berzon, Tallman